

387-08/GMV/BGC
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
Commercial Fleet of Donbass and
Ardemar Marine Limited
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)
Barbara G. Carnevale (BC 1651)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COMMERCIAL FLEET OF DONBASS and
ARDEMAR MARINE LIMITED,

                    Plaintiffs,

    -against-

BRASPACT CO. LTD. a/k/a BRASPACT CO.
LIMITED and STRADCOM RESOURCES (HK)
LIMITED a/k/a STRADCOM RESOURCES,

                    Defendants.

**08 CV**

**VERIFIED COMPLAINT**

---

        Plaintiffs, Commercial Fleet of Donbass (hereinafter "Commercial Fleet") and Ardemar

Marine Limited (hereinafter "Ardemar") (collectively "Plaintiffs") for their Verified Complaint

against Defendants Braspact Co. Ltd. a/k/a Braspact Co. Limited (hereinafter "Braspact") and

Stradcom Resources (HK) Limited a/k/a Stradcom Resources (hereinafter "Stradcom") allege

upon information and belief as follows:

        1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq*.

2.      At all times material hereto, Plaintiff Commercial Fleet was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 89, Lunina Ave., Mariupol, Ukraine, 87510.

3.      At all times material hereto, Plaintiff Ardemar was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 24a, Archimidous Street, Nicosia 2411, Cyprus.

4.      At all times relevant hereto, Defendant Braspact was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 3905 Two Exchange Square, 8 Connaught Place, Central, Hong Kong.

5.      At all times relevant hereto, Defendant Stradcom was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 3908 Two Exchange Square, Suite 7492, 8 Connaught Place, Central, Hong Kong.

6.      On or about November 14, 2007, Defendant Braspact, as charterer, entered into a maritime contract of charter party with Plaintiffs, as head owners/disponent owners to carry iron ore fines on board the M/V MAKEEVKA from Aratu, Brazil to Longkou, China.  (Annexed hereto as Exhibit A is the proforma charter party and recap).

7.      Defendant Stradcom guaranteed the performance of Defendant Braspact under the charter party.

8.    Pursuant to the terms of the charter party, the vessel was duly delivered into service under the charter and during the course of the voyage, freight was earned by Plaintiffs and the Defendant, Braspact, became liable for demurrage.

9.    On or about February 11, 2008, Plaintiffs provided Defendants with a Final Freight Account showing a net sum (after certain deductions were made) in the amount of $574,822.98 earned and due in favor of Plaintiffs under the charter. (Annexed hereto as Exhibit B is the Final Freight Account dated February 11, 2008).

10.    In breach of the charter, and despite due demand, Defendant Braspact, as charterer, and Defendant Stradcom, as guarantor under the charter party, have failed and/or otherwise refused to pay hire/demurrage amounts due and outstanding in the amount of $574,822.98, the entire amount of which remains unpaid and owing.

11.    Plaintiffs have fulfilled all obligations required under the charter party.

12.    The charter party recap provides for the application of English law and disputes between the parties to be resolved by arbitration in London, and Plaintiffs specifically reserve the right to proceed in arbitration.

13.    This action is brought to obtain jurisdiction over Defendants and to obtain security in favor of Plaintiffs in respect to its claims against Defendants and in aid of London proceedings.

14.    This action is further brought to obtain security for any additional sums to cover Plaintiffs' anticipated attorneys' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiffs' claim under English law.

15.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorneys' fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiffs' claim.

16.     Plaintiffs estimate, as nearly as can be computed, that the legal expenses and arbitral costs of prosecuting the claim in London will be $180,000.00 and interest on its damages are estimated to be $114,964.57 (calculated at 8% for a period of 2 ½ years, the estimated time for completion of the proceedings in London).

### Request for Rule B Relief

17.     Upon information and belief, and after investigation, Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiffs are informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in either of their names at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

18.     The total amount to be attached pursuant to the calculations set forth above is **$869,787.55**.

WHEREFORE, Plaintiffs pray:

a.      That process in due form of law according to the practice of this Court may issue against Defendants citing them to appear and answer the foregoing;

b.      That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including **$869,787.55** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers,

accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendants (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in either of their names or as may be held, received or transferred for their benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any judgment entered against the Defendants in the London proceedings; and

d.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       July ___, 2008

Respectfully submitted,

Gina M. Venezia (GV 1551)
Barbara G. Carnevale (BC 1651)
FREEHILL HOGAN & MAHAR, LLP
80 Pine Street
New York, NY 10005
Tel: (212) 425-1900
Fax: (212) 425-1901
Attorneys for Plaintiffs Commercial Fleet of
Donbass and Ardemar Marine Limited

## ATTORNEY VERIFICATION

State of New York        )
                                        ) ss.:
County of New York  )

Gina M. Venezia, being duly sworn, deposes and says as follows:

1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiffs in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.    The reason this verification is made by an attorney and not by the Plaintiffs is because the Plaintiffs are foreign entities, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
22 day of July, 2008.

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

| 1.  PLACE AND DATE | M/V MAKEEVKA / BRASPACT CO LTD – HONG KONG    . |
|---|---|
| ATHENS  14 November 2007 | |

<table>
<tr><td>

**2.     Owners/Despondent Owners/TC Owners**
HEAD OWNERS: **COMMERCIAL FLEET OF DONBASS, 89, LUNINA AVE, MARIUPOL, UKRAINE, 87510**
DISP OWNERS/CARRIERS/FRT BENEFICIARY: **ARDEMAR MARINE LIMITED, 24A ARCHIMIDOUS STR, NICOSIA 2411, CYPRUS**
MANAGERS : **CFD SHIPPING LTD, 89, LUNINA AVE., MARIUPOL, UKRAINE 87510**

</td><td>

**3. Charterers**
**BRASPACT CO LTD**, 3905 TWO EXCHANGE SQUARE, 8 CONNEAUGHT PLACE, CENTRAL, HONG KONG,
performace guaranteed by
**STRADCOM RESOURCES**, 3908 TWO EXCHANGE SQUARE, SUITE 7492, 8 CONNEAUGHT PLACE, CENTRAL, HONG KONG

</td></tr>
</table>

<table>
<tr><td>

**4. Vessel's Name and Particulars**

M/V MAKEEVKA AS DESCRIBED IN ATACHMENT NO 4
OWNERS QUARANTEE THAT VSL IS SUITABLE FOR SPOUT TRIMMED AND GRAB DISCH.

P&I CLUB : **BRITISH MARINE LUXEMBOURG, LONDON**
H&M : **ASKA, AKVARINE, REINSURER INGOSSTRAKH, RUSSIA**
E) ISM/ISPS/DOC/ISSC/CLASS CERTIFICATES ALL VALID.
**BENEFICIARY'S BANKERS:**
IBAN CY23 0030 0178 0000 0178 3311 1625
BANK: MARFIN POPULAR BANK PUBLIC CO LTD
NICOSIA CYPRUS
SWIFT CODE : LIKICY2NXXX
BANK CORRESPONDENT: JP MORGAN CHASE, NEW YORK, USA
CORR ACCOUNT NO: 001-1-190-683
SWIFT : CHASUS33

</td><td>

**5. Cargo:**
CARGO FROM ARATU IS IRON ORE FINES HARMLESS CARGO AND FROM COSIPA IS MILL SCALE ALSO HARMLESS CARGO BUT NOT MIXABLE SINCE DIFFERENT GRADES.
CARGO NOT LIABLE TO LIQUEFACTION. NO HBI, DRI ARE PERMITTED. GRADES SHALL BE NATURALLY SEPERATED BY HOLDS.
CHRTS WOULD LIKE UPTO MAX PERMISSIBLE DRAFT IN COSIPA AND TO TOP OFF AT ARATU WHERE DRAFT 11,68M
OWNERS STOW PLAN
BASIS 1 LOAD PORT ARATU  TTL CARGO 27000 MTS
BASIS 2 LOAD PORTS 'COSIPA+ARATU"
HOLD 1/4500, HOLD 2/6400, HOLD 3/4600 FOR ARATU,
HOLD 4/6400, HOLD 5/5100  TTL  27000 MTS

|  |
|---|
| **6.     Loading  & Discharging Port:** |
| LOAD PORT 1GSPB ARATU AA AND OR CHOPT 1/2 GSPB COSIPA WHERE DRAFT 31 FEET BW (1017) M AND TOP OFF AT ARATU.
DISCH PORT 1/2 GSB LONGKOU AND OR CHOPT 1/2 GSB QINGDAO OR TIANJIN ALWAYS AFLOAT.
SHIFTING EXPENSES FOR 2ND BERTH IF USED TO BE FOR OWNERS ACCOUNT AND SHIFTING TIME TO COUNT |
| **7.     L/CAN** |
| **22/26 NOVEMBER 2007.**
IN CASE CHARTERERS NOMINATE 1ST LOADING PORT COSIPA CAN ACCEPT THE VESSEL EARLIER  WITH 3 DAYS NOTICE BEFORE VESSEL'S ARRIVAL BUT NOT LATER THAN 26TH NOVEMBER. |

</td></tr>
</table>

<table>
<tr><td>

**8.     Freight Rate:**

FRT USD 108,50 PMT BASIS 1/1 AND USD 2,50 PMT BASIS 2/1 FIO SPOUT AND OR CRANE TRIMMED ,
PAYABLE 95 PCT W/IN 7 BANKING DAYS AFTER S/R BS/L
MARKED 'FREIGHT PAYABLE AS PER C/P', LESS COMMISSIONS AND DESPATCH IF ANY.
BALANCE TOGETHER WITH DEM/DESPATCH W/IN 20 DAYS AFTER COMPLETION OF DISCHARGE AND RECEIPT OF ORIGINAL NORS/SOF DULY SIGNED BY MASTER/AGENTS BENDS, SHIPPERS / RECEIVERS OR THEIR REPRESENTATIVES.
FAX COPIES ACCEPTABLE.
FREIGHT DEEMED EARNED UPON LOADING DISCOUNTLESS AND NON REURNABLE VSL A/O CARGO LOST OR NOT LOST.

</td><td>

**9.Loading and Discharging Terms**

LOAD RATE **7000** MTNS PWWD OF 24 CONS HOURS SHINC/DISC RATE **15000** TNS PWWD OF 24 CONS HOUR SHINC  N.O.R TO BE TENDERED BETWEEN 08:00 TO 17:00 HOURS MONDAY TO FRIDAY AND NOON SAT BENDS
TURN TIME AT LOAD PORT **24**HRS AND AT DISCH PORT  **12** HRS EVEN IF USED BENDS.  OWNERS TO GIVE ALWAYS 3 DAYS DEFINITE NOTICE OF EXACT DATE OF ARRIVAL. OWNERS TO GIVE 3/2 DAYS NOTICE AND 24 HRS DEFINITE NOTICE OF ARRIVAL.

|  |
|---|
| **10. Demurrage and Despatch Money rate** |
| DEM USD 37,500  PDPR HDWTS BENDS |

</td></tr>
</table>

| 11.  Additional Clauses covering special provisions, |
|---|

Charterers Agents both ends,
**At Load Port Messrs: Caboto Comercial e Marítima Ltda.** Rua da Grécia 165 8th floor – ed. Serra da Raiz – Comércio, CEP 40.010.010 – Salvador – Bahia – Brazil,
Phone: +5571 2410611 Fax: +5571 2415022 Telex : 71 3965 ctom br / 71 1141 dant br    email: opessa@caboto.com.br  Contact Person: Mr. Marinus Polmann Mobile Tel:+55 71 9127 8846
**At Disch Port Messrs:** REVERTING
ANY TAXES DUES WHARFAGES ON CARGO FOR CHRTS ACCOUNT. BRAZILIAN MERCHANT RENEWAL, INFRAMAR, QDP, UTILISATION TAXES FOR CHRTS / SHIPPERS ACCOUNT.  ANY TAXES DUES WHARFAGES ON VSL INC FRT TAX IF ANY FOR OWNERS ACCNT
EXINS IF ANY, DUE TO VSL'S AGE OVER 20 YEARS OWNERS TO CONTRIBUTE USD 6000 WHICH TO BE DEDUCTED FROM FREIGHT.
ARBITRATION IN LONDON ENGLISH LAW TO APPLY.
2,50 PCT ADDRESS COMMISSION PLUS 1,25 PCT TO ACCESS MARITIME – ATHENS  PLUS 1,25 TO TASSIA SHIPPING INC.
FIXTURE TO BE KEPT STRICTLY  P+C

All other terms and conditions are pursuant to C/P General Provisions
For chartering vessels to transport steelmaking raw materials

| Signature (Owners) | Signature (Charerers) |
|---|---|
| | |

M/V MAKEEVKA /BRASPACT CO LIMITED
CHARTER PARTY DATED 14<sup>TH</sup> NOVEMBER 2007
GENERAL PROVISIONS

**1. Performing Vessel, Loading/Discharging Port(s)**

The vessel named in Box 4 of the Charter Party, being suitable for mechanical loading and discharging including grab loading and discharging, and in every respect fitted for the voyage, all as per vessels description, shall with all possible dispatch, sail and proceed to the loading port(s) indicated in Box 6 of the Charter Party and there load, always safe and afloat, in the customary manner, from the Charterers in such dock as may be ordered by them, a full and complete cargo in bulk as described in Box 5 of the Charter Party, being so loaded, the vessel shall therewith proceed with all possible dispatch to the discharging port(s) inserted in Box 7 of the Charter Party as ordered on the signed Bills of Lading.

The vessel must comply with all applicable commonwealth, state and local laws and regulations including Coast Guard Regulations, navigation regulations and customs, ITF and WWF regulations, and port and harbor regulations at the loading and discharging ports, and must attain the highest Lloyds classification or the equivalent. If the vessel suffers any problems due to the vessel's equipment, including the hold ladder, it shall be the Owners' responsibility and the time and expenses required to settle such problems shall be borne by the Owners.

**2. Loading/Discharging**

(a) No cargo shall be loaded in the deep tanks, provided the grabs can operate, nor in any compartment not accessible for discharging by means of the mechanical equipments, and all cargo shall be loaded in the holds only that mechanical loading and discharging equipments can be accessible always subject the vessels description/construction. Should any cargo be loaded by the vessel in above excepted places, any time lost and any additional expenses incurred in loading, trimming or discharging such cargo to be for the Owners' account.

(b) The vessel's tanks tops and the shaft tunnel (if any) to be adequately protected by the owners by ceiling and sheathing to prevent damage by loading/discharging equipments.

(c) If the shore regulations permit, the Master shall open hatches prior to tendering and shall cover the hatch of each hold as soon as the loading or discharging into same has finished, and also all hatches when the loading or discharging has finished for the day, if the weather be wet or threatening. He shall also, during rain or snow, cover up or close all hatches by which loading or discharging is not actually going on.

(d) The Pilot, Master, Officers and crew of the vessel, and any tow boat, person or facility assisting the vessel, shall not be agents or employees of the Charterers, and the Charterers shall not be liable for and the Owners defend the Charterers from any loss, damage or claim resulting from, or arising out of, negligence or error of any of them while the vessel is proceeding to, or lying at, any place of loading or discharging.

**3. Loading & Discharging Terms**

***(a) Loading Terms***
A Notice or Readiness may be tendered after the arrival of the vessel, which must be in free pratique, at the loading port, between 08:00 and 17:00 hours Mondays-Fridays and Noon Saturdays , whether in berth or not, whether in port or not, whether customs have cleared or not, and the vessel is in every respect ready to receive the cargo. If a quarantine inspection is not available within 6hrs from vessel's arrival, then Notice of Readiness may be tendered on the vessel's arrival off the port without free pratique. However, if the vessel is found not ready in every respect, then the time shall not be counted from time of rejection until she is ready.

Laytime at the first or sole loading port shall commence turn time hours stated in Box 10 of the Charter Party after a Notice or Readiness is tendered . If loading has commenced before lay time has begun, one-half the time actually used until the expiration of the turn time shall be counted as laytime.
Laytime at the second loading port to count on arrival provided NOR tendered and accept.

*(b) Discharging Terms*

A notice or Readiness may be tendered between 08:00 to 17:00 hrs Mondays-Fridays and Noon Saturdays, immediately upon the vessel's arrival, whether in berth or not, whether in port or not, whether customs have cleared or not, WIFPON, provided that the vessel is in every respect ready for discharging. If the vessel in berth, however, is found not ready in every respect for discharging, then the time shall not be counted from time of rejection until she is ready for discharging. If the vessel is unable to commence discharging due to port authorities' denial of free pratique,due to vessel's fault, then such time shall not be counted as laytime.

Laytime shall begin at the first or sole discharging port turn time hours stated in Box 10 of the Charter Party after a Notice of Readiness is tendered. If discharging has commenced before laytime has commenced, one-half the time actually used until the expiration of the turn time shall be counted as laytime. Laytime from the second discharging port, if any, shall be counted from arrival, provided that a Notice of Readiness is tendered and accepted.

## 4. Laytime and Cancelling Date

The laydays for loading shall not commence before opening the layday of the respective voyage indicated in Box 8 of the Charter Party. However, vessel retain the right to tender NOR before the Laydays but for laytime to commence as per CP.

Owners to give always 3 days definite notice of exact date of arrival. The Charterers shall have the option to declare within 1 working day, whether they keep or cancel the contract without any binding. Owners to give 3/2 days notice and then 24 hour definite notice of arrival. In the event Owners, 4 days prior's vessels ETA, foresee the vessel miss cancelling date, the Charterers shall be notified immediately with new date. Upon receipt of such notification the Charterers have 48 running hours to declare option of charter party cancel. Otherwise the date nominated by Owners shall be considered as a new cancelling date. .

The charterers shall have the option of cancelling this charter if any wilful misrepresentation is made respecting the size, position, state of the vessel, such option to be declared on or before notice of readiness being given ,unless discovered later.

## 5. ETA Notice

The Owners and the Master shall notify the Charterers, their nominees, the Shippers, the shippers' agents at the loading port and Coemos Shipping Co s.a 3 days prior to the vessel's definite DAY of arrival at the loading port, and every two (2) days thereafter in addition to a twenty-four (24) hour prior notice of ETA at the loading port.

Upon setting sail from the loading port(s), the Owners and the Master shall notify the Charterers, their nominees and the Charterers' agent , at the discharging port of the vessel's name, the tonnage by hold, and by brand loaded on the Bills of Lading, the sailing date and the estimated time of arrival at the discharging port. Furthermore, the Owners and the Master shall notify the Charterers, their nominees ,receivers, CoemosShipping Co s.a and the Charterers' agent at the discharging port of the vessel's ETA every two (2) days after setting sail from the loading port and twenty-four (24) hours prior to the vessel' estimated time of arrival at the discharging port.

The Charterers may ask the vessel's position, if necessary, at any time during the voyage, in which case the Owners must advise of the vessel's latest position at that time.

## 6. Laytime Calculation

(a) Laytime shall cease to count upon the completion of loading and discharging. The vessel shall sail from the loading port and the discharging port as soon as the loading and discharging are completed, barring unforeseen circumstances.

(b) Shifting expenses at the loading berth(s) shall be borne by the Owners and the time shall count as laytime unless ordered for Owners purposes. At the discharging berth(s), the first shifting expenses shall be borne by the Owners and the time shall count as laytime, but after that, the charges from the second shifting shall be borne by the party requested such shifting and the time shall count only when requested by Charterers.

If the port authorities request the shifting, the expenses shall be borne by Owners and the time shall not count.

(c) Shifting time from anchorage to the loading and discharging berth(s), shall not count as laytime, even if the vessel is already on demurrage.

(d) The time needed by the vessel for draft checking's (whether by customs surveyor, other appointed surveyor, master or other) shall not count as laytime.

(e) Time used for the initial and final surveys shall not be counted as laytime.

(f) Any stoppage of loading and discharging at the vessel's request shall not be counted as lay time ,shifting of loading equipments from hold to hold not to count as lay time.

(g) Time justly required to complete the loading and discharging, and to repair any damages, for which the Charterers or Consignees are liable, shall be included in the unexpired laytime, if any.

(h) Lighterage, if any ,at discharging port(s) shall be at the receivers/Charterers risk/cost/time and expense, and time shall count as laytime.If Shanghai be declared to be the discharging port and no draft available at Discharging berths, Discharging and or lightering to place at anchorage at Receivers risk/cost / time and expense, and time shall count as laytime.

(i) Any time lost in the extra trimming, while Charterers wait for instructions from the Master, shall not count as laytime.

(j) In case normal loading has to be interrupted due to insufficient ballast pump capacity in relation to loading capacity, any such time lost shall not count as laytime.

(k) In case the loading of the vessel is remarkably slowed or suspended due to the vessel's responsibility the Owners must shift the vessel to waiting anchorage and rebirth at the port when reloading is available. The cost of shifting in and out of the berth shall be at the Owners' expense and such time shall not count as laytime. Time also lost due to the vessels/masters disruption and interference causing slowing down of the loading shall not count as lay time unless such slowdown is not due to vessels fault or construction in which case laytime to count

(l) Normal working hours at the loading and discharging ports shall be understood as weather working day of twenty-four (24) consecutive hours including Saturdays, Sundays and Holidays.

(m) The opening and closing of hatches at the commencement and completion of the loading and discharging at each port, shall be at the Owners' expense, provided that the port authorities allow for such, and the time used therefore shall not count as laytime.

(n) Time lost due to line troubles and mechanical breakdowns of the transhipper, loader and unloader at the loading and discharging ports shall count as laytime. Time lost delaying to berth due to line trouble and mechanical breakdowns of loading and unloader also to count as laytime.

(o) Time lost due to changing of shore workman gangs, stevedores etc., performing the loading and unloading shall count as laytime

(p) Turn time at the loading and discharging port shall apply even if demurrage has already begun to accrue.

(q) delete.

## 7. Force Majeure

The demurrage shall be paid to the Owners at the rate stated in Box 11 of the Charter Party per day or pro rata for any part of a day except any time lost by force majeure, war (whether declared or undeclared) or hostilities, insurrection, civil commotion, political disturbance, riots, epidemics, strikes or lockouts, fire, floods, frosts, excessive rains, storms, stoppage or delay on railway, canal, quay, wharf, jetty, rope or cable way, loading or discharging plants and equipment, lack of trucks, stoppage of pitmen, trimmers or other hands connected with the working or delivery of the cargo for which the vessel is stemmed, breakdown of the machinery at the mines or governmental restrictions or control on imports, exports or foreign exchange, whether partial or general, or the time when by any cause of nature beyond the control of the Charterers or the Owners, supplying, loading,

discharging or conveyance of the cargo from the mines to the vessel is prevented or delayed, such time shall not count or be considered as part of the laytime for loading or discharging.

Should a strike or any other cause prevent the loading of a vessel at the time the vessel is ready to sail from the last discharging port, and provided that such strike or other cause is not likely to be settled prior to the vessel's arrival at the loading port, the Charterers and the Owners shall mutually and in good faith agree on new laydays or terminating for the particular voyage. However, if no agreement is reached, the Charter Party terms shall prevail.
DELETE AND INCERT CL 16 and 17 of GENCON1994

## 8. Bills of Lading

(a) The Master shall sign the Bills of Lading as soon as the cargo is on board, as presented, without prejudice to this charter.

(b) Cargo quantity stated on the Bills of Lading to be ascertained by draft survey contacted by Owners surveyor jointly with Shippers/Charterers surveyor and custom surveyor, cost of Owners surveyor for Owners account and Shippers/Charterers surveyor for their account.
Same procedure as loading port to apply for discharging port (participating also receivers surveyor ) for ascertaining cargo quantity discharged but Owners not to be responsible for any discrepancy in the discharging figures due to loss of humidity of cargo.

The freight and all conditions are as per this General Provisions.

(c) In case the original Bills of Lading are not available upon the vessel's arrival at the discharging port, the Owners shall be allowed to release the cargo on board without producing the original Bills of Lading against the Charterers' L.O.I., the wording of which shall be as per the Owners' P&I Club without bank signature, but aforesaid LOI shall be made with charterer's letterhead with charterers and receivers stamp and signature.

The Charterers undertake to present one endorsed original Bill of Lading to Owners at a later stage and the Original LOI to be returned to Charterers by Owners.

## 9. Freight

The freight stated in Box 9 of the Charter Party is in full of port charges, consulages, light, agency fees on the vessel, , and all other dues/fees customarily paid or payable by the vessels, and to be deemed earned as the cargo shipped on board, discountless and non returnable, whether the vessel and/or the cargo lost or not lost.

The freight is always basis F.I.O.SPOUTTRIMMED. 95 pct of the freight less commissions and despatch to be paid within SEVEN (7) banking days after completion of loading and signing and releasing Bills of Lading marked "Freight payable as per Charter Party" and Owners to provide original freight invoice with Owners' signature. Bs/L to be issued immediately upon completion of loading. If Bs/L are not ready, then time for payment will start to count upon releasing of Bs/L. The balance together with demurrage/despatch if any at loading/discharging port to be settled within twenty (20) days from the date when the Original invoices and supporting vouchers bends have been received after the completion of discharge ,which should be duly Signed by master/agents/shippers/receivers or their representatives (IE:NOR/SOF). Fax copies acceptable.

## 10. Demurrage & Dispatch Money

Demurrage and dispatch money rates at the loading and discharging ports shall be as per Box 11 of the Charter Party. Demurrage or dispatch at the loading and discharging ports shall be settled between the Charterers and the Owners within twenty (20) days from the date when the Original invoices and supporting vouchers have been received after the discharging was completed.NOR/SOF should be signed by Master,Agents,Shippers and Receivers or their representatives respectively. Fax copies also acceptable.

## 11. Loading/Discharging Costs

The cargo shall be delivered free on board by the Charterers at their expense. The extra trimming other than spout or bulldozer charges if required by the vessel shall be for the Owners' account. The cargo shall be

discharged and to be taken from the vessel at the Receivers' risk and expense. The vessel always supplies winches and power to work same, but shore winch men, if required, shall be for the Receivers' account.

**12. In case of Substitute Vessel**
Owners to give 12 Days Definite Notice of Arrival of Substitute Vessel, together with full description of vessel and necessary questionnaire, as stated herein  clause 33.
Vessel to be Maximum 25 years

**13.  Addition Premiums**
All additional insurance premiums, if any, charged on the cargo due to the vessel's age, class, flag or ownership shall be at the Owners' expense. If the Owners do not pay additional insurance premium directly, the Charterers shall have the right to deduct   additional insurance premiums from the freight balance against relevant supporting vouchers, but the maximum premium which owners are to be responsible for is USD6,000 only.

**14. Taxes/Dues**

Any taxes/dues/wharfages on cargo to be for Charterers account both ends. Brazilian merchant renewal, Inframar, QDP, utilization taxes to be for Charterers / Shippers account.
Any taxes/dues/wharfages including freight taxes on vessel to be for Owners account.

**15. Overtime**

The overtime shall be at the expense of the party that requested such overtime; however, if requested by the port authorities, such overtime shall be at Shippers/Receivers expense. The Officers' and crews' overtime shall be at the Owners' expense.

**16. Penalty**

In the event Owners, 4 days prior vessel's ETA, foresee the vessel miss her canceling date, the Charterers shall be notified immediately with new date. Upon receipt of such notification the Charterers have 48 running hours to declare option of charter party cancel. Otherwise the date nominated by Owners shall be considered as a new canceling date.

**17.  Non-Performance**

The penalty for non-performance of this agreement, proved damages, shall not exceed the estimated amount of the freight.

**18. Stevedore Damage**

The Charterers shall not be responsible for any stevedore damage under this Charter Party. Such damage, if any, shall be settled between the Owners and the Stevedores directly; however, should the Owners fail to receive prompt settlement of stevedore claims from the Stevedores, the Owners can request the Charterers' assistance in the settlement of all stevedore claims that may exist between the Owners and the Stevedores and charterers will Endeavor to assist owner for settlement the stevedore damage.

**19. Agency**

Charterer's agent at discharging port and loading port.

**20. Owners' & Vessel's Responsibilities & Liabilities**

(a) The vessel shall provide all the necessary light for working on board at night.

(b) The vessel shall sail from the loading port as soon as the loading is complete, weather and tides permitting.

(c) The vessel shall be left in seaworthy trim for proceeding between the berths and ports to the Master's and the port authorities' satisfaction.

(d) The Owners shall provide the Charterers with the general arrangement plan and capacity plan of the performing vessel at any time if required by the Charterers.

(e) The Owners or Despondent owners or Time Charterers shall be members of the P&I Club, individually each one otherwise it shall be deemed that Owners ,Despondent Owners, Time Charterers have failed to meet their obligations under the Charter Party.

(f) The Owners must guarantee that the vessel is not precluded from due and normal performance under this Charter by virtue of any previous trading.

(g) In case the vessel loses its turn (inclusive line-up to berth), a turn which is consistent with the prevailing practices of all ports and railway authorities, for any reason attributable to the Owners or to the vessel, including the Owners' misrepresentation-excepting, however, reasons deemed Acts of God and perils of the sea the time lost thereby and the relevant proved damages thereof, if any, shall be at the Owners' expense.

## 21. Lien

The Owners shall have a lien on the cargo for freight, dead-freight and demurrage, and it is agreed that all liability of the Charterers shall cease as soon as the cargo is shipped and the freight, dead freight and demurrage in loading and in discharging (if any) are paid.

## 22. Sublet

The Owners cannot sublet the contract without Charterers' consent.
Charterers are not allowed to sublet hole or part of the vessel spaces without Owners consent.

## 23. Negligence Clause

The Act of God and perils of the seas accepted. Also, fire, barratry of the Master and crew, pirates, collisions, strandings and accidents of the navigation, or latent defects in or accidents to, the hull and/or the machinery and/or the boilers always excepted, even when occasioned by the negligence, default or error in judgment of the Pilot, Master, Mariners or other persons employed by the Ship-owners or for whose acts he is responsible, not resulting, however, in any case from want of the due diligence by the Owners of the ship, or by the ship's husband or the manager. The Charterers shall not be answerable for any negligence, default, or error in judgment of the trimmers or the stevedores employed in loading or discharging the cargo.

## 24. Both to Blame Collision Clause

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of this ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.
The foregoing provisions shall also apply where the Owners, Operators, or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contract".

## 25. New Jason Clause

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible by statute, contract, or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers.

## 26. General Average

General Average shall be adjusted, stated and settled, according to York/Antwerp Rules, 1974 or any amendments thereto, in London. English Law to apply.

## 27. War Risks Clause for Voyage Chartering, 2004 (Code Name: VOYWAR 2004)
(a) For the purpose of this Clause, the words:

    (i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (ii) "War Risks" shall include any actual, threatened or reported:

War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(d) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

   (ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, or in order to fulfil the Owners' obligation under this Charter Party, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners within 14 days after receipt of the Owners' invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterer shall reimburse the Owners for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after completion of discharge.

(f)  The Vessel shall have liberty:-

   (i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

   (ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

   (iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

   (iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

   (v)  to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

   (vi)  where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(g)  If in compliance with any of the provisions of sub-clauses (b) to (f) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

**28. Altered Destination**
In case of any hands war risk, striking work, quarantine or epidemic in the original port of the destination, the Charterers during the voyage of this Charter are entitled, but not obliged, to alter by wire the original port of the destination to other ports always sub owners approval .

### 29. Deviation

The vessel shall have the liberty to call at any ports on route, to sail with or without pilots, to tow and to be towed, to assist the vessels in distress, and to deviate for the purpose of saving life or property or bunkering. The Owners shall notify the Charterers as soon as deviation is made for any purpose.

### 30. Protection and Indemnity Bunkering

The vessel in addition to all other liberties shall have the liberty as part of the contract voyage and at any stage thereof to proceed to any port(s) whatsoever whether such ports are on or off the direct and/or customary route(s) to the ports of loading or discharging named in this Charter and there take oil bunkers in any quantity in the discretion of the Owners even to the full capacity of the fuel tanks, deep tanks and any other compartment, in which oil can be carried, whether such amount is or is not required for the chartered voyage.

### 31. Arbitration

Any dispute, controversies, or differences which may arise between the parties, out of or relation to or in connection with this contract or for the breach thereof, shall be finally settled by arbitration in London, England in accordance with the Commercial Arbitration Rules of the English Commercial Arbitration Board and under the law of England. The award rendered by the arbitrator(s) shall be final and binding upon both parties concerned.
Small claims up to USD 150,000 to be settled as per LMAA 2002 Rules.

### 32. Bimco ISM Standard Clause

BIMCO STANDARD ISM /Iisps CLAUSE FOR VOYAGE CHARTERPARTIES  apply:
From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM/ISPS Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM/ISPS Code shall be for the Owners' account."

33. **VESSEL'S DESCRIPTION**

MV  MAKEEVKA

```
TYPE                   :     BULK CARRIER
CLASS                  :     RMR KM* BULK
YARD AND YEAR BUILT    :     GANGAN SHIPBUILDING YARD, CHINA, 10 JUNE
1982
FLAG, HOMEPORT         :     UKRAINE, MARIUPOL
GRT/NRT INTERNATIONAL:       17989 / 10667
        PANAMA CANAL   :     19116 / 15438 ( ISSUED 17.10.94 )
        SUEZ CANAL     :     18153.61 / 14913.89 ( ISSUED 17.02.86 )
LOA, LBP, BEAM         :     196.47 / 183.00 / 23.00 M
DEPTH MOULDED          :     14.30 M
```

```
DWAT IN METRIC TONS:
     TROPICAL : 28958 / 10.45
     SUMMER   : 28160 / 10.24
     WINTER   : 27317 / 10.02
     FRESHWATER ALLOWANCE ON SUMMER MARKS : 232 MM
     PCT      :      38.61
```

TYPE OF HATCH COVERS:    MCGREGOR TYPE

NUMBER AND SIZES OF HATCHES

|      | L / B         |
|------|---------------|
| NO.1 | 17.5  X 11.0  |
| NO.2 | 21.58 X 11.0  |
| NO.3 | 13.28 X 11.0  |
| NO.4 | 21.58 X 11.0  |
| NO.5 | 17.43 X 11.0  |

NUMBER AND SIZES OF HOLDS

|      | L       |   | B            | H     |
|------|---------|---|--------------|-------|
| NO.1 | 27.85 X |   | 8.00/22.00   | 13,4  |
| NO.2 | 31.54 X |   | 22.00        | 12,6  |
| NO.3 | 21.58 X |   | 23.00        | 12,6  |
| NO.4 | 31.54 X |   | 23.00        | 12,6  |
| N0.5 | 28.22 X |   | 22.40 / 7.20 | 12,6  |

CUBIC CAPACITIES ARE ALL CLEAR AND AVAILABLE FOR CARGO,
   INCLUDING HATCHCOAMING SPACE:

|       | CBM. | GRAIN / BALE  |
|-------|------|---------------|
| NO.1  |      | 6761  / 6518  |
| NO.2  |      | 8205  / 7951  |
| NO.3  |      | 5595  / 5421  |
| NO.4  |      | 8204  / 7949  |
| NO.5  |      | 6700  / 6472  |
| TTL   |      | 35465 / 34311 |

```
WING TANKS HOLD NO.2    2 X 594
           NO.3    2 X 406
           NO.4    2 X 594
           NO.5    2 X 481
```

```
MAXIMUM UNIFORM LOAD ON TANKTOP:
ON DECK AREA NR.1/2/4/5 : 17MT/M2
ON DECK 3.HOLDS : 23.1 MT/M2
ON HATCHCOVERS: 2.2 MT/M2
```

ON MAIN DECK : 2.75 MT/M2

FULL SPEED AND CONSUMPTION
LADEN   ABT  12,5 KNT ON ABT IFO 180 21 MTS PLUS ABT 2,2 MDO
BALLAST ABT  13,0 KNT ON ABT IFO 180 21 MTS PLUS ABT 2,2 MDO

IN GOOD WEATHER CONDITIONS UP TO WIND FORCE 4 OF BEAUFORT SCALE
AND SEASTATE 3 OF DOUGLAS SCALE.

VSL BURNS MDO WHEN MANEUVERING, WHEN STEAMING IN CONFINED WATER.


BUNKER CONSUMPTION IN PORT PER 24 HOURS:
    WORKING     2.5 MT MDO    +   1 MTS   IFO PD
    IDLE        1.8 MT MDO    +   1 MTS   IFO PD

BUNKER FUEL CAPACITIES        :      IFO - 1354.1 MTS
                                     MDO -  238.6 MTS


CARGO GEAR
  NUMBER                  -  4 CARGO HYDRAULIC CRANES
  CAPACITY                -  25 T
STATE WHERE SITUATED - NO.1 BETWEEN HLDS 1-2
                     NO.2  -  "  -    2-3
                     NO.3  -  "  -    3-4
                     NO.4  _  "  -    4-5
                         CRANES NOS.1-3      CRANES NOS.2-4
  MAX.OUTSWING         -  20  M AT 25 DGRS   22 M AT 25 DGS
  MIN                  -  4.5 M AT 78.5 DGS  4.5 M AT 78.39 DGS

WATER BALLAST TANK CAPACITY  : 10877 CBM - 11148.9 MTS
WATER BALLAST HOLD(S) CAPACITY:
BALLASTING CAPACITY           :      550 M CUB / HOUR (FACT 500 )
DEBALLASTING CAPACITY         :      550 M CUB / HOUR

MAIN ENGINE.
MAKE AND TYPE:MITSUI ENG.& SH.BUILD.
B&W 8L55GCA (D) DIESSEL ENGINE
MAX CONTINUOUS OUTPUT    : 10700 BHP

PANDI COVERED BY BRITISH MARINE LUXEMBURG

ALL DTLS ABT


OWNERS GUARANTEE THAT VSL IS SUITABLE FOR SPOUT TRIMMED
AND GRAB DISCH

**CFD / Kuchinskiy Igor**

| | |
|---|---|
| **От:** | &lt;tassiachart@netone.gr&gt; |
| **Кому:** | &lt;chartering@cfdshipping.com&gt; |
| **Отправлено:** | 14 ноября 2007 г. 18:33 |
| **Тема:** | M/V MAKEEVKA / BRASPACT CO LTD - HONG KO |

TASSIA SHIPPING INC.
TEL: +30-(210)-4283727 MOB: +30-6944-513387
E-MAIL: tassiachart@netone.gr

Date:14 Nov 2007. Time: 18:32. Our Ref: 90789-GIR.

TO: CFD - COMMERCIAL FLEET OF DONBASS

IGOR/GEORGE

M/V MAKEEVKA / BRASPACT CO LTD - HONG KONG
CP DD 14.11.2007
----

FURTHER OUR NEGOS PLS FIND BELOW CLEAN RECAP OF FIXTURE WITH ALL SUBS IN ORDER
WHICH PLS RECONFIRM FOR GOOD ORDER'S SHAKE.

MV  MAKEEVKA

TYPE          :    BULK CARRIER
CLASS         :    RMR KM* BULK
YARD AND YEAR BUILT :    GANGAN SHIPBUILDING YARD, CHINA, 10 JUNE 1982
FLAG, HOMEPORT    :    UKRAINE, MARIUPOL
GRT/NRT INTERNATIONAL:    17989 / 10667
    PANAMA CANAL :    19116 / 15438 ( ISSUED 17.10.94 )
    SUEZ CANAL   :    18153.61 / 14913.89 ( ISSUED 17.02.86 )
LOA, LBP, BEAM    :    196.47 / 183.00 / 23.00 M
DEPTH MOULDED     :    14.30 M

DWAT IN METRIC TONS:
    TROPICAL : 28958 / 10.45
    SUMMER   : 28160 / 10.24
    WINTER   : 27317 / 10.02
    FRESHWATER ALLOWANCE ON SUMMER MARKS : 232 MM
    PCT   :    38.61

TYPE OF HATCH COVERS:    MCGREGOR TYPE

NUMBER AND SIZES OF HATCHES
        L  / B
    NO.1  17.5 X 11.0
    NO.2  21.58 X 11.0
    NO.3  13.28 X 11.0
    NO.4  21.58 X 11.0

27.03.2008

NO.5  17.43 X 11.0

NUMBER AND SIZES OF HOLDS

|      | L       | B          | H            |       |
|------|---------|------------|--------------|-------|
| NO.1 | 27.85 X | 8.00/22.00 |              | 13,4  |
| NO.2 | 31.54 X | 22.00      |              | 12,6  |
| NO.3 | 21.58 X | 23.00      |              | 12,6  |
| NO.4 | 31.54 X | 23.00      |              | 12,6  |
| N0.5 | 28.22 X | 22.40 / 7.20 |            | 12,6  |

CUBIC CAPACITIES ARE ALL CLEAR AND AVAILABLE FOR CARGO,
 INCLUDING HATCHCOAMING SPACE:

|      | CBM.  | GRAIN / BALE |
|------|-------|--------------|
| NO.1 | 6761  | / 6518       |
| NO.2 | 8205  | / 7951       |
| NO.3 | 5595  | / 5421       |
| NO.4 | 8204  | / 7949       |
| NO.5 | 6700  | / 6472       |
| -------------------------- |
| TTL  | 35465 | / 34311      |

WING TANKS HOLD NO.2    2 X 594
            NO.3    2 X 406
            NO.4    2 X 594
            NO.5    2 X 481


MAXIMUM UNIFORM LOAD ON TANKTOP:
ON DECK AREA NR.1/2/4/5 : 17MT/M2
ON DECK 3.HOLDS : 23.1 MT/M2
ON HATCHCOVERS: 2.2 MT/M2
ON MAIN DECK : 2.75 MT/M2

FULL SPEED AND CONSUMPTION
LADEN  ABT  12,5 KNT ON ABT IFO 180 21 MTS PLUS ABT 2,2 MDO
BALLAST ABT  13,0 KNT ON ABT IFO 180 21 MTS PLUS ABT 2,2 MDO

IN GOOD WEATHER CONDITIONS UP TO WIND FORCE 4 OF BEAUFORT SCALE
AND SEASTATE 3 OF DOUGLAS SCALE.

VSL BURNS MDO WHEN MANEUVERING, WHEN STEAMING IN CONFINED WATER.


BUNKER CONSUMPTION IN PORT PER 24 HOURS:
  WORKING    2.5 MT MDO   + 1 MTS  IFO PD
  IDLE       1.8 MT MDO   + 1 MTS  IFO PD

BUNKER FUEL CAPACITIES    :    IFO - 1354.1 MTS
                MDO - 238.6 MTS


CARGO GEAR
  NUMBER       - 4 CARGO HYDRAULIC CRANES
  CAPACITY     - 25 T

27.03.2008

STATE WHERE SITUATED - NO.1 BETWEEN HLDS 1-2
```
            NO.2 - " -    2-3
            N0.3 - " -    3-4
            NO.4 _ " -    4-5
            CRANES NOS.1-3    CRANES NOS.2-4
MAX.OUTSWING      - 20  M AT 25 DGRS    22 M AT 25 DGS
MIN            - 4.5 M AT 78.5 DGS    4.5 M AT 78.39 DGS
```

WATER BALLAST TANK CAPACITY : 10877 CBM - 11148.9 MTS
WATER BALLAST HOLD(S) CAPACITY:
BALLASTING CAPACITY        :      550 M CUB / HOUR (FACT 500 )
DEBALLASTING CAPACITY      :      550 M CUB / HOUR

MAIN ENGINE.
MAKE AND TYPE:MITSUI ENG.& SH.BUILD.
B&W 8L55GCA (D) DIESSEL ENGINE
MAX CONTINUOUS OUTPUT   : 10700 BHP

PANDI COVERED BY BRITISH MARINE LUXEMBURG

ALL DTLS ABT


OWNERS GUARANTEE THAT VSL IS SUITABLE FOR SPOUT TRIMMED
AND GRAB DISCH


- ACCNT MESSRS 'BRASPACT CO LIMITED', 3905 TWO EXCHANGE SQUARE, 8
CONNEAUGHT
  PLACE, CENTRAL, HONG KONG.
  PERFORMANCE IS GUARANTEED BY M/S STRADCOM RESOURCES, 3908 TWO
EXCHANGE
  SQUARE, SUITE 7492, 8 CONNEAUGHT PLACE, CENTRAL, HONG KONG

- LOADING PORT : 1 GSPB ARATU  AA  AND OR CHOPT
  1/2 GSPB COSIPA WHERE DRAFT 31 FEET BW (1017) M AND TOP OFF AT ARATU

  DISCHARGING PORT : 1/2  GSB  LONGKOU  AND OR CHOPT
  1/2 GSB QINGDAO  OR TIANJIN  ALWAYS AFLOAT

- CARGO FROM ARATU IS IRON ORE FINES HARMLESS CARGO AND FROM COSIPA IS
  MILL SCALE ALSO HARMLESS CARGO BUT NOT MIXABLE SINCE DIFFERENT
GRADES.
  CARGO NOT LIABLE TO LIQUEFACTION. NO HBI, DRI ARE PERMITTED. GRADES
SHALL
  BE NATURALLY SEPARATED BY HOLDS

  CHRTS WOULD LIKE UP TO MAX PERMISSIBLE DRAFT IN COSIPA AND TO TOP OFF
AT
  ARATU WHERE DRAFT 11,68M DRAFT
OWS ST.PLAN :

BASIS 1 LOAD PORT "ARATU" TTL CGO 27000 MTS

BASIS 2 LOAD PORTS "COSIPA + ARATU"

27.03.2008

HOLD 1/4500
HOLD 2/6400
HOLD 3/4600 FOR ARATU
HOLD 4/6400
HOLD 5/5100
TTL 27000. MTS

- 7.000 MTNS LOAD/ 15.000 MTNS DISCH SHINC PWWD BENDS

- LAYCAN 22-26 NOV /07
 IN CASE CHRTS NOMINATE 1ST LOADING PORT COSIPA CAN ACCEPT THE VSL
EARLIER WITH

 3 DAYS DEFINITE NOTICE BEFORE VSLS ARRIVAL BUT NOT LATER THAN 26TH NOV

- FRT USD 108,50 BASIS 1/1 AND USD 2,50 MORE BASIS 2/1 PMT FIO SPOUT  AND OR
 CRANE TRIMMED
 95 PCT W/IN 7 BD AFTER S/R BS/L
 MARKED FRT "PAYABLE AS PER C/P,LESS COMM AND DESPATCH IF ANY  BALANCE
 TOGETHER WITH DEM/DESPATCH W/IN 20 DAYS AFTER COMPLETION    OF DISCH
AND
 RECEIPT OF ORIGINAL NORS/SOF DULY SIGNED BY MASTER/AGENTS    BENDS
 SHIPPERS/RECEIVERS OR THEIR REPRESENTATIVES. FAX COPIES ACCEPTABLE.

- FRT DEEMED EARNED UPON LOADING DISCOUNTLESS AND NON RETURNABLE VSL
A/O
 CARGO LOST OR NOT

- DEM USD 37500 HDWTSBENDS

- CHABE

- TT 24 HOURS AT LOAD PORT AND 12 HOURS AT DISCH PORT

- EXINS IF ANY, DUE TO VESSEL'S AGE OVER 20 YEARS OWNERS TO CONTRIBUTE
 USD 6000 WHICH TO BE DEDUCTED FROM FREIGHT

- ANY TAXES DUES WHARFAGES ON CARGO TO BE FOR CHRTS ACCNT

- BRAZILIAN MERCHANT RENEWAL, INFRAMAR, QDP, UTILISATION TAXES FOR
CHRTS /
SHIPPERS ACCOUNT

- ANY TAXES DUES WHARFAGES INC FRT TAXES ON VSL FOR OWNERS ACCNT,

- ARB LONDON ENGLISH LAW TO APPLY

- STEM/SHIPPERS/RECEIVERS APPROVAL IN ORDER

- OWISE AS PER CHRTS EXECUTED P/F C/P WITH 3,75 PCT + 1.25 TO TASSIA,
 LOGICALLY AMMENDED AS PER MAIN TERMS AND WITH FOLL ALTERATIONS


CL 3. A) LAYTIME AT SECOND LOADPORT TO COUNT ON ARRIVAL PROVIDED NOR

TENDERED, ACCEPTED.
CL 4  TO READ:
OWNERS TO GIVE ALWAYS 3 DAYS DEFINITE NOTICE OF EXACT DATE OF
ARRIVAL.
OWNERS TO GIVE 3/2 DAYS NOTICE AND THEN 24 HOURS DEFINITE NOTICE OF
ARRIVAL.
IN THE EVENT OWNERS, 4 DAYS PRIOR'S VSLS ETA, FORESEE THE VESSEL MISS
CANCELLING DATE THE CHARTERERS
SHALL BE NOTIFIED IMMEDIATELY WITH NEW DATE. UPON RECEIPT SUCH
NOTIFICATION THE CHARTERERS HAVE 48 RUNNING HOURS TO DECLARE OPTION
OF CHARTER
PARTY CANCEL. OWISE THE DATE NOMINATED BY OWNERS SHALL BE CONSIDERED
AS A NEW
CANCELLING DATE.
CL 6.   b) SHIFTING TIME TO COUNT AS LAYTIME UNLESS ORDERED FOR  OWNERS
PURPOSES .
h) LIGHTERAGE RECEIVERS/CHARTERERS RISK/COST/TIME.
TO AMMEND FOR SHANGHAI : AND TIME SHALL COUNT AS LAYTIME.
q) TO DELETE

CL 8B- CARGO QTY STATED ON THE BS/L TO BE ASCERTAINED BY DRAFT SURVEY
CONTACTED  BY OWNERS SURVEYOR JOINTLY  WITH  SHIPPERS /CHRTS
SURVEYOR
AND CUSTOM SURVEYOR, COST OF OWNERS SURVEYOR FOR OWNERS ACCOUNT
AND SHIPPERS
/CHARTS  SURVEYOR  FOR THEIR  ACNT .

SAME PROCEDURE AS LOADING PORT TO APPLY FOR DISCHARGING PORT
(PARTICIPATING
ALSO RCVRS SURVEYOR ) FOR ASCERTAINING CARGO QUANTITY DISCHARGED BUT
OWNERS
NOT TO BE RESPONSIBLE FOR ANY DISCREPANCY IN THE DISCH FUGURES DUE TO
LOSS
OF HUMIDITY OF THE CARGO.

CL 8C TO REMAIN AS PER P/F CP. AT THE END ADD
THE CHARTERERS UNDERTAKE TO PRESENT ONE ENDORSED ORIGINAL B/L TO
OWNERS AT A
LATER STAGE AND THEN THE ORIGINAL LOI TO BE RETURNED TO CHARTERERS BY
OWNERS.


CL 10 TO AMEND PER M/T
CL 11 TO DELETE : "NECESSARY MEN"
CL 12. TO REPLACE 25 YEARS
CL 14. TO AMEND PER M/T.
CL 16. AS PER CLAUSE 4 AMMENDMENT
CL 21. AT THE BEGINNING TO READ 'THE OWNERS SHALL...' INSTEAD OF 'THE
MASTER
SHALL'.
CL 22. TO ADD: CHARTERERS ARE NOT ALLOWED TO SUBLET HOLE OR PART OF THE
VESSEL
SPACES  WITHOUT OWNERS CONSENT.

VSL TO GIVE NOTICES TO AGENTS AT LOAD PORT AS FOLLOWS

Caboto Comercial e Mari_tima Ltda.
Rua da Grecia 165 8th floor - ed. Serra da Raiz - Comercio
CEP 40.010.010 - Salvador - Bahia - Brazil
Phone : +5571 40097676
Fax : +5571 40097628
Telex : 051 94075749 ctom g
e-mail : caboto@caboto.com.br
DIRECT:  MARINUS POLMAN E-MAIL    marinus@caboto.com.br  AND
polman@terra.com.br
AOH:
Operations Mgr   : Marinus Polman    +5571 91278846


TKS VM YR COOPERATION LEADING TO THIS FIXTURE

BRGDS/GR


[Message sent via SOFTWAY Communication Program]


--
This message has been scanned for viruses and
dangerous content by MailScanner, and is
believed to be clean.

**ARDEMAR MARINE LIMITED**

24a, Archimidous Street

Engomi

Nicosia 2411

Cyprus

DATE 11.02.08

**FINAL FREIGHT ACCOUNT**

VESSEL      :    MAKEEVKA
CHARTERERS :    "BRASPACT CO. LTD", HONG KONG

| | | | | | |
|---|---|---|---|---|---|
| FREIGHT      :    **27 000,00** | at USD | 108,50 | | USD | 2 929 500,00 |
| PLUS DEMURRAGE  AT ARATU | | | | USD | 469 549,85 |

| | | | |
|---|---|---|---|
| TOTAL | | USD | **3 399 049,85** |

| | | | |
|---|---|---|---|
| LESS COMMISSION      3,75% | USD | 127 464,37 | |
| LESS DESPATCH AT LONGKOU | USD | 23 593,75 | |
| LESS OAP | USD | 6 000,00 | |
| LESS ALREADY RECEIVED | USD | 2 667 168,75 | |

| | |
|---|---|
| TOTAL | 2 824 226,87 |

| | | |
|---|---|---|
| IN OWNERS FAVOUR | USD | **574 822,98** |

THE CHARTERES ARE KINDLY REQUESTED TO REMIT THE FUNDS OF USD
    574 822,98      TO THE OWNERS ACCOUNT :

BENEFICIARY:                      ARDEMAR MARINE LIMITED,
BENEFICIARY'S ADDRESS: 24A, ARCHIMIDOUS STREET,
                                            ENGOMI, NICOSIA 2411, CYPRUS
BENEFICIARY'S IBAN:      CY23 0030 0178 0000 0178 3311 1625
BENEFICIARY'S BANK:      MARFIN POPULAR BANK PUBLIC CO LTD
BENEFICIARY'S BANK'S ADDRESS: NICOSIA, CYPRUS
SWIFT CODE:                     LIKICY2NXXX
BANK CORRESPONDENT:  JP MORGAN CHASE, NEW YORK, USA
CORR.ACCOUNT NO.:        001-1-190-683
SWIFT :                               CHASUS33

Sincerely yours,